UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RONALD DAVIDSON,

                Plaintiff,

      -vs-                               95-CV-00204-RJA

NICHOLAS BRZEZNIAK,

                Defendant.
_____

## INTRODUCTION

Plaintiff Ronald Davidson, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action in March 1995 pursuant to 42 U.S.C. § 1983 seeking damages to compensate for injuries allegedly sustained as the result of an incident at the Attica Correctional Facility.  In his *pro se* complaint, plaintiff alleged that on February 3, 1993, Corrections Officer Nicholas Brzezniak intentionally kicked him in the back without provocation, subjecting him to excessive use of force in violation of the Eighth Amendment's prohibition against cruel and unusual punishment, the First Amendment's prohibition against retaliation for filing grievances and lawsuits, and the state law of assault and battery.

From the outset, the progress of this litigation was severely hampered by delays attributable, at least in some measure, to both parties.  For example, due to plaintiff's initial mis-identification of defendant Brzezniak, and as a function of changes in staffing and reassignment of responsibility for defense of plaintiff's pending lawsuits among attorneys in the New York State Attorney General's Buffalo office, service upon defendant did not

take place until April 1996, and the answer was not filed until May 1996.  Once underway, discovery proceeded at an exceedingly slow pace as the result of the parties' extensive motion practice to address recurring problems with document production, scheduling and taking depositions, and other procedural matters–all compounded by plaintiff's transfer from one correctional facility to another, as well as issues relating to his allegations regarding DOCS employees' confiscation of his legal papers and indifference to his medical complaints.

In October 1998, the Court appointed James Gresens, Esq., to serve as plaintiff's counsel in this matter but, despite exemplary efforts by Mr. Gresens and his associates to expedite discovery, the deposition scheduling problems persisted.  In an effort to address plaintiff's ongoing medical concerns, the Court eventually directed that plaintiff's deposition be taken by video conference from his place of incarceration.   This was finally accomplished in early 2003.  *See* Dkt. No. 272.

In early 2004, upon being notified that discovery was substantially complete, the Court granted defendant's motion for separate trials on the issues of liability and damages *see* Dkt. No. 283, and scheduled jury selection for the liability trial to commence in October 2005.   *See* Dkt. No. 287.   This date was subsequently adjourned several times to accommodate plaintiff's health concerns.  *See* Dkt. Nos. 295, 315, 327, 339, 343, 347, 351.  By order dated September 24, 2009, the Court memorialized plaintiff's agreement to waive his right to trial by jury in order to allow him to appear at the trial by video conference from his place of incarceration, and scheduled the trial for early May 2010.  Dkt. No. 356.

Following reassignment of the matter to the undersigned, and two further adjournments, the two-day non-jury trial on liability finally took place on March 29 and 31,

2011, with plaintiff appearing by video conference from the Shawangunk Correctional Facility.  The Court received the parties' post-trial written submissions, and heard closing arguments on June 21, 2011.

The following constitutes the Court's findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.[1]

## FINDINGS OF FACT

The facts relating to plaintiff's claim were developed at trial by way of the testimony of plaintiff and two witnesses called on his behalf: Henry Haas, former Investigator for the New York State Police Bureau of Criminal Investigations ("BCI"), and former DOCS Sergeant Joseph Falcone.  Defendant Brzezniak testified on his own behalf, and the Court allowed plaintiff to present testimony on rebuttal.  What follows is a summary of the trial testimony.

## 1.    Plaintiff Ronald Davidson

Plaintiff testified that, on February 3, 1993, he was assigned to the general population at Attica and was housed in "A" Block, Company Number 7, Cell Number 17. He had been reassigned the previous day from the Special Housing Unit ("SHU"), where

---

[1]Rule 52 states in relevant part:

In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58.

Fed. R. Civ. P. 52(a).  While "punctilious detail" is not required, *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir.1999) (internal quotation marks omitted), the Court must set forth its findings and conclusions sufficiently to permit meaningful appellate review.  *See, e.g., United States v. Sasso*, 215 F.3d 283, 292 (2d Cir. 2000).

he had spent a six-month period of disciplinary segregation.  Upon returning to the general population from the SHU, plaintiff was placed on "keeplock" status, which entailed twenty-three hours per day of cell confinement and one hour of recreation in the exercise yard, referred to as "keeplock rec."  Dkt. No. 389 (Trial Transcript, 3/29/2011), pp. 7-8.

At approximately 7:15 a.m. on February 3, plaintiff and a few other inmates from Company 7 were being escorted from their cells to the exercise yard by a Corrections Officer.  The Company 7 gallery is located on the ground floor, referred to as the "flats." The route to the exercise yard proceeds through a gate at the end of the gallery into an area where the lock boxes are located adjacent to the lobby; then into the lobby area; then through another gate to the "A" Corridor where a door leads to the "A" Yard.  Plaintiff testified that on the morning of February 3, 1993, when the escort reached the doorway leading from the lock box area to the lobby, the inmates passed through a "gauntlet" of approximately six to eight prison guards.  He testified that defendant Brzezniak was at the end of the gauntlet, and as plaintiff passed by him defendant kicked plaintiff in the lower back. He felt a sharp sensation, and was propelled forward a step or two.  According to plaintiff, Officer Brzezniak then stated: "[W]elcome back, this is to let you know what's in store for you if you continue with your grievances and lawsuits."  Plaintiff testified that it "was well-known to the jailers" at the Attica facility that he had previously availed himself of his right to file grievances and lawsuits.  *Id.* at 9-13.

Plaintiff proceeded to the exercise yard, where he joined several other "A" Block keeplock inmates.  He had a conversation with inmate Ronald Dean, who told plaintiff that he saw what happened and would be a witness for plaintiff.  After returning to his cell from the exercise yard, plaintiff reported the incident both to Corrections Counselor Paula

Kerwin and to Sergeant Joseph Falcone, the supervising officer in charge of "A" Block operations.  Sergeant Falcone told plaintiff that he would investigate the matter.  Plaintiff then reported the incident to Nurse Linda Keating during a previously scheduled in-cell sick call visit, and Nurse Keating referred plaintiff to the facility clinic where he was seen by a physicians' assistant named Bobby McGee.  Polaroid photographs were taken of plaintiff's back, but he did not receive any treatment or medications from either the nurse or the physicians' assistant.  *Id.* at 13-18.

Plaintiff testified that Sergeant Falcone returned to plaintiff's cell on the afternoon February 3, 1993, after speaking to Officer Brzezniak.  According to plaintiff, Sergeant Falcone told him that defendant admitted kicking plaintiff, but "he didn't mean to kick you.  He was just showing off.  He meant to kick the air, but he made contact with you.  He connected."  *Id.* at 34.

Plaintiff's ambulatory health records reflect that he was seen by the sick call nurse on February 2, 1993–the day before the incident at issue–to follow up on his complaints of back pain.  Plaintiff's Exh. 1, p. 1.  Plaintiff testified that his back pain was long-standing, and was greatly exacerbated by the incident on February 3, 1993.  He was seen again by the sick call nurse on February 4 and 9, and made repeated requests for an appointment with the facility's physician, Dr. O'Connell, to have an MRI done.  *Id.* at 6.  Dr. O'Connell saw plaintiff on February 10, and again on February 18, and on both occasions denied plaintiff's request for an MRI citing medical risk due to complaints of physical discomfort during a previously scheduled MRI procedure.  *Id.* at 4-5; Dkt. No. 389, at 25-33.

On February 22, 1993, plaintiff wrote a letter to the Superintendent of the New York State Police advising that he wanted to press charges against Officer Brzezniak, and

requesting an investigation of the incident.  Plaintiff's Exh. 4.  On March 2, 1993, plaintiff was interviewed by Investigator Henry Haas of the New York State Police Bureau of Criminal Investigations, and signed a "Supporting Deposition" (Plaintiff's Exh. 2A, at 6) containing his written statement of the incident.  Dkt. No. 389, at 34-38.

On cross-examination, plaintiff testified that he had filed several grievances against defendant Brzezniak both before and after the incident at issue in this case complaining about various verbal insults or threats.  He did not file a grievance about the incident at issue, and has not filed any lawsuits against defendant other than the present action.  He testified that he filed at least 40 grievances about his treatment by various officers at Attica prior to February 3, 1993, and at least 40 or 50 grievances about his treatment at Attica after the incident at issue.  He was transferred out of the Attica facility in the spring of 1994.  Dkt. No. 389, at 44-48.

Plaintiff testified that on the day of the incident, as he was passing through the gauntlet of officers leading to the "A" Block lobby, he noticed somebody on the staircase leading down from the galleries on the floors above the flats who would have witnessed the kick.  He thought it might be an inmate he knew named Ronald Dean, who at the time was assigned to Company 10 on the third floor of the block.  When he got to the exercise yard, he spoke with inmate Dean, who confirmed that he had witnessed the incident and would provide a written statement to that effect.  *Id.* at 50-52.

Plaintiff testified that there were no marks on his back immediately after he was kicked, but a red mark developed later that evening, and bruising developed within a day or two.  He could not tell if there was any swelling, but the area of the kick was tender.  Polaroid photographs of plaintiff's back taken approximately two hours after the incident

did not show bruising, redness, or swelling.  There was pain on movement, coughing, and deep breathing.  *Id.* at 63-64.

On redirect examination, plaintiff testified that the grievances he filed against defendant Brzezniak both before and after the incident at issue were often processed by a procedure known as "buck-slipping," whereby the grievance ends up being investigated by the very person it was filed against.  When defendant investigated the buck-slipped grievances filed by plaintiff, he made threatening remarks toward plaintiff.  With regard to the incident at issue, plaintiff testified that he did not see defendant kick him in the back, but he turned around immediately after feeling the force of the kick, and defendant was the only officer standing there.  Defendant then made the statement welcoming plaintiff back to the block.  *Id.* at 67-70.

## 2.    BCI Investigator Henry Haas

At the time of the events at issue, Henry Haas was an investigator with the New York State Police BCI, assigned out of Troop A in Warsaw, New York.  In early March 1993 he was contacted by Gerald Stout, the Wyoming County District Attorney, who requested that Mr. Haas conduct an investigation of a matter brought to his attention by a letter from an inmate at the Attica Correctional Facility.  After reading the letter, Mr. Haas and Investigator Martin Hockey went to the Attica facility and interviewed plaintiff, Officer Brzezniak, inmate Ronald Dean, and Deputy Superintendent Edward Donnelly.  Mr. Haas prepared a written report in the regular course of his duties as a BCI investigator (Plaintiff's Exh. 2).  The report is date-stamped as received by BCI on June 9, 1993.  It contains a

two-page narrative of the investigation, along with the supporting depositions of plaintiff (Plaintiff's Exh. 2A) and inmate Dean (Plaintiff's Exh. 2B).  Dkt. No. 389, at 71-76.

Mr. Haas testified that, as reflected in the narrative section of his BCI report, plaintiff advised him during the interview on March 3, 1993, that the incident involving Officer Brzezniak had been observed by another inmate, identified as Ronald Dean.  Mr. Haas interviewed Mr. Dean, who told him that he saw a heavy-set corrections officer kick Mr. Davidson in the back of his lower leg.  Mr. Haas also interviewed Deputy Superintendent Donnelly, who stated that he had interviewed Officer Brzezniak and was advised that he did not have any involvement with Mr. Davidson on the date of the incident alleged, or at any other time.  *Id.* at 77-79.

On cross-examination, Mr. Haas testified that his investigation of the incident did not result in prosecution, and the case was closed.  *Id.* at 79-80.

### 3.    DOCS Sergeant Joseph Falcone

Mr. Falcone testified that on February 3, 1993, he was employed by DOCS as the supervising sergeant in charge of "A" Block at the Attica Correctional Facility.  He sent a memorandum to Deputy Superintendent Donnelly on that date (Plaintiff's Exh. 6) reporting that, as he was making his periodic rounds on "A" Block, inmate Davidson made a complaint that he had been kicked by Officer Brzezniak.  Mr. Falcone reviewed the log book entries for that date indicating that, at 7:20 a.m., twelve inmates went to "KL (keeplock) rec."  Plaintiff's Exh. 3, p. 2.  At 9:15 a.m., Corrections Counselor Paula Kerwin provided "tier assistance" to inmate Davidson.  *Id.* at 3.  According to Mr. Falcone, a log book entry for "tier assistance" ordinarily indicates that the counselor met with the inmate

to provide assistance in preparation for an upcoming "Tier" disciplinary hearing.  Dkt. No. 390, at 3-9.

Mr. Falcone testified that, after plaintiff told him about the incident that morning, he went to speak with Officer Brzezniak.  Brzezniak was stationed at 1 Company, located directly across the lobby from 7 Company.  Officer Brzezniak told Mr. Falcone that he did not even know Davidson, and he denied kicking him.  According to Mr. Falcone, it was a matter of common knowledge throughout the Attica facility that plaintiff had filed numerous grievances against corrections officers.  *Id.* at 10-16.

Mr. Falcone testified that he was present when the Polaroid photographs of plaintiff were taken on February 3, 1993.  He also testified that, while it was possible he spoke with plaintiff a second time on February 3 after he spoke with Officer Brzezniak, he did not recall having the conversation, and he did not tell plaintiff that Officer Brzezniak admitted kicking plaintiff.  *Id.* at 19-23.

On cross-examination, Mr. Falcone reiterated that he did not tell plaintiff Officer Brzezniak admitted to kicking plaintiff, or that he said it was just an accident.  Mr. Falcone was shown the Polaroid photographs of plaintiff taken on February 3, 1993 (Defendant's Exhs. 1 and 2).  Mr. Falcone testified that he took plaintiff to the hospital to document that there were no visible signs of injury, and he was present when the photographs were taken.  Writing on the back of the photographs indicates that they were taken by Sergeant Kaufman on February 3, 1993, at 1:55 p.m.  Dkt. No. 390, at 23-26.

Mr. Falcone testified that plaintiff did not tell him about another inmate having witnessed the incident.  He also testified that plaintiff's history of filing grievances and lawsuits was common knowledge throughout the state correctional facilities.  Mr. Falcone

had investigated numerous grievances filed by plaintiff while he was at Attica, and had interviewed plaintiff on each of those occasions.  Mr. Falcone also explained that to maintain order on the block during keeplock rec callout, inmates from galleries on the same floor would be taken out to the yard together.  Companies 7 and 12 on the flats would be run together; Companies 8 and 11 on the second floor would be run together; and Companies 9 and 10 on the third floor would be run together.  Inmates from galleries on other floors would ordinarily remain behind their locked gallery gates while other floors were being let out, and it would not be the case that inmates from Company 10 would be on the staircase when inmates from Company 7 were coming through the lock box area.  *Id.* at 27-34.

### 4.    Defendant Nicholas Brzezniak

Defendant testified that he has been a corrections officer for almost 25 years, and has worked at the Attica facility since September 1987.  His primary responsibility is care, custody and control of approximately 84 inmates housed in Companies 1 and 6 of "A" Block, which are the galleries on the first floor "flats" on the other side of the lobby from Companies 7 and 12.  The procedure for letting inmates out for keeplock rec ordinarily begins with a morning cell check to determine inmate activity for the day.  Once the cell count clears, the hall captain gives instructions for all companies to break the keeplock inmates out of their cells and hold them on the floor.  The captain then gives instructions to release one floor at a time, gallery by gallery, to the lobby and out to the yard.  Usually one side of the block is cleared first, followed by the other side.  For example, Companies 1 and 6 on the north side flats are cleared first, one at a time, followed by Companies 7

and 12 on the south side flats.  Some inmates might be frisked at random to check for weapons before being taken to the yard.  For reasons of security, inmates from different floors would not be cleared to the yard at the same time.  Dkt. No. 390, at 38-41; 49-50.

Defendant testified that on the morning of February 3, 1993, he was working the 7 a.m. to 3 p.m. shift at his position on "A" Block, 1 Company.  He was stationed in the lock box area of 1 Company, approximately 40-50 feet across the lobby from the lock box area of 7 Company where plaintiff claims the incident at issue occurred.  After cell count, he received the instruction to break out the keeplocks for exercise.  Once out of their cells, the inmates remained on the gallery behind the locked gate where they were observed by defendant from his position in the lock box area.  When the instruction came to release the inmates to the yard, defendant opened the gate and the inmates from 1 Company were escorted by other officers through the lobby and into the yard.  *Id.* at 42-45.

Defendant testified that at the time he was letting his gallery out to keeplock rec on February 3, 1993, he had never heard of inmate Davidson or his reputation for filing a lot of grievances.  The first time he heard of plaintiff was when Sergeant Falcone came to him later that morning and told him about plaintiff's accusation.  Falcone also told him that plaintiff was a compulsive paperwork inmate, and Falcone instructed defendant to put his statement about the accusation in writing.  Defendant identified Exhibit 4 as his written response to plaintiff's allegations regarding the incident at issue.  *Id.* at 45-47.

Defendant testified that the officers at Attica had never formed a "gauntlet" for inmates to pass through before entering the lobby.  He also testified that he did not have any contact with plaintiff on February 3, 1993; he did not recall ever having to respond to a grievance filed against him by plaintiff; he did not recall having any interaction with

plaintiff following the accusation on February 3rd; he did not go over to 7 Company at any time on that date; he did not kick any inmate on that date; and he had never heard of an inmate named Ronald Dean prior to that date. *Id.* at 47-51.

On cross-examination, defendant testified that inmates were housed in the Special Housing Unit or placed on keeplock status as disciplinary punishment. These inmates were generally known to be problem inmates. He testified that because Attica is a maximum security facility, all inmates are considered "Max A" and they are all treated the same by corrections officers, but if the officers were aware of potential problems with certain inmates they would tell each other. The problems usually involved weapons, drugs, and sexual assaults. Occasionally, the officers would warn each other about certain inmates who filed a lot of grievances. Defendant testified that, having been employed at Attica for 25 years, he has had complaints (or "tabs") and grievances filed against him, but he did not know plaintiff nor did he know about his practice of filing grievances. According to defendant, it was not the practice at Attica for the corrections officer who was the subject of the complaint or grievance to investigate the circumstances of the complaint himself. Rather, the investigation was ordinarily performed by the sergeant. He previously testified at his deposition in this action that, while it was human nature for a corrections officer to become aggravated by a frivolous grievance, he had never witnessed an officer taking action against an inmate as retribution for filing a grievance. Dkt. No. 391, at 4-17.

Officer Brzezniak explained that there are 12 companies in "A" Block, and each company has a corrections officer assigned to it. His duty as a company officer during keeplock rec includes releasing the inmates on his gallery from their cells, and when instructed, opening the gallery gate and sending the inmates out to the yard. They are

escorted to the yard by three officers on duty in the lobby area. The company officer does not escort the inmates to the yard himself. When the inmates are cleared from the gallery he secures the gate, and the inmates walk in front of him to the lobby area. All 12 galleries on the block are scheduled for keeplock rec at the same time, but the galleries are released one at a time. Defendant testified that, although it might be possible for inmates from all of four galleries on one floor to be passing through the lobby area at the same time, he could not recall if that ever happened. He testified that, although it is possible for a corrections officer in charge of a particular company to have contact with inmates from other companies, during keeplock rec he did not generally roam about the lobby area but stayed in the doorway to 1 and 6 Company because he still had responsibility for the inmates remaining in their cells. He also testified that it was common practice to release Companies 7 and 12 first, followed by Companies 1 and 6, so that inmates from 7 and 12 Company were already in the yard by the time he got to the doorway between the galleries and the lobby. *Id.* at 18-27, 29-35.

Defendant testified that at the time of the alleged incident at issue he weighed about 330 pounds. He is five feet, eleven inches tall. He did not know inmate Ronald Dean who was housed in Company 10. *Id.* at 40.

## 5.    Plaintiff's Rebuttal

On rebuttal, plaintiff testified that he has an Associate of Science Degree in Liberal Studies, and a Bachelor of Science Degree in Community and Human Services with a concentration in Criminal Justice, from the State University of New York, Empire State College. He arrived at the Attica facility in October 1991, and was initially assigned to "C"

Block for a short period.  He was reassigned to "A" Block, and remained there until he was sent to special housing.  *Id.* at 51-52.

Plaintiff testified that African-American inmates comprised the largest ethnic group in "A" Block, followed by Hispanics, and then Whites.  Middle-aged White men, like plaintiff, comprised an even smaller subset of inmates.  Plaintiff testified further that he had been elected to the Committee on Inmate Grievances at another DOCS facility, and was familiar with the grievance procedures at Attica.  According to plaintiff, when a complaint, tab, or formal grievance was filed against a corrections officer, it would be referred to the supervising employee.  The supervisor would then give the grievance to the subject, who would fill out the investigation report.  So essentially, the person grieved would investigate himself.  *Id.* at 52-55.  Plaintiff testified that corrections officers demonstrated hostility to inmates who filed grievances, as well as to the grievance procedure itself.  *Id.* at 57-58.

Plaintiff testified that when there was a small group of keeplock inmates going to rec, especially in the colder months, the practice was send all of the inmates from "A" Block out to the yard together.  According to plaintiff, corrections officers were free to go anywhere they wanted in the cell block, and when company officers had cleared their galleries for keeplock rec they would go to another floor or area to provide additional coverage and security presence.  Plaintiff explained that he did not mention inmate Dean to Sergeant Falcone due to the possibility of reprisals against Dean for agreeing to provide a witness statement.  *Id.* at 58-63.

**CONCLUSIONS OF LAW**

I.     **42 U.S.C. § 1983**

Plaintiff's claims are authorized by 42 U.S.C. § 1983, which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The statute creates no substantive rights, but "merely provides remedies for deprivations of rights established elsewhere." *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985); *see also Sykes v. James*,  13 F.3d 515, 519 (2d Cir. 1993), *cert. denied*, 512 U.S. 1240 (1994).

In order to establish a claim under 42 U.S.C. § 1983, the plaintiff must show by a preponderance of the evidence that: (1) the conduct complained of was committed by a person acting under color of state law; (2) this conduct deprived the plaintiff of rights and privileges secured by the Constitution or laws of the United States; and (3) the defendant's acts were the proximate cause of the injuries and consequent damages sustained by the plaintiff.  *Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, *reh. denied*, 445 U.S. 920 (1980)); *see also Eagleston v. Guido*, 41 F.3d 865, 872 (2d Cir. 1994) ("Police officers may be held personally liable for damages under 42 U.S.C. § 1983 when, acting under color of state law, they deprive a person of 'any rights, privileges, or immunities secured by the Constitution.' "), *cert. denied*, 516 U.S. 808 (1995).

In this case, there is no question that Officer Brzezniak was acting under color of state law in his capacity as a Corrections Officer at the Attica Correctional Facility on February 3, 1993, at the time of the incident alleged.  Accordingly, to prevail on his Section 1983 claims in this case, plaintiff must establish by a preponderance of the evidence that Officer Brzezniak engaged in conduct that deprived plaintiff of a constitutional right, and that this conduct proximately caused plaintiff to suffer injury and consequent damages. *See Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998) ("[I]n a retaliation case, as in all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury.").  Plaintiff claims that Officer Brzezniak's conduct amounted to violations of the Eighth Amendment's prohibition against cruel and unusual punishment and the First Amendment's prohibition against retaliation for filing grievances and lawsuits against prison officials.

### A.    Eighth Amendment/Excessive Force

A claim by a prisoner that he was subjected to excessive force by a prison employee is analyzed by the trier of fact by reference to the Eighth Amendment's prohibition against cruel and unusual punishments.  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Whitley v. Albers*, 475 U.S. 312, 318-26 (1986) (claim of excessive force to subdue convicted prisoner is to be analyzed under an Eighth Amendment standard)).  An Eighth Amendment excessive use of force claim has both a subjective component, "focusing on the defendant's motive for his conduct," and an objective component, "focusing on the conduct's effect."  *Wright*, 554 F.3d at 268 (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8

(1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)); *see also Davidson v. Flynn*, 32 F.3d 27, 28 (2d Cir. 1994).

The subjective component of a prison inmate's excessive force claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991) (other quotation marks and citation omitted). The "wantonness" inquiry turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7; *see also Davidson v. Flynn*, 32 F.3d at 30 ("The key inquiry under *Hudson* and its precedents is whether the alleged conduct involved 'unnecessary and wanton infliction of pain.' ").

The objective component of a prison inmate's excessive force claim focuses on the seriousness of the injury, in light of "contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), *quoted in Hudson*, 503 U.S. at 8. In assessing this component, the trier of fact is asked to determine whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Hudson*, 503 U.S. at 8 (quoting *Wilson*, 501 U.S. at 303). The Eighth Amendment's prohibition against cruel and unusual punishment does not extend to "*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 10; *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."), *cert. denied*, 414 U.S. 1033 (1973). "But when prison officials use

force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. . . . This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9).[2]

Evaluating the proof presented at trial in light of these standards, the Court finds that plaintiff has failed to establish either component of his excessive force claim by a preponderance of the evidence. With regard to the objective component, the only admissible evidence offered to suggest that plaintiff suffered any injury at all on February 3, 1993 is plaintiff's self-serving testimony that he felt pain when defendant kicked him in the back, and that the kick exacerbated his pre-existing lower back problems. To corroborate his version of the facts, plaintiff relies on the "supporting deposition" of inmate Ronald Dean, which the Court admitted as part of the investigative report of State Police Inspector Haas subject to defense counsel's reservation of the right to object to the admission of the substance of the statement as hearsay. Defendant has now exercised that right.

The statement, dated March 2, 1993, reads as follows:

I am a[n] inmate at Attica . . . . Last month in February, I don't know the day, it was early in the morning I was locked in A10-22, keep locked, and was going to keep lock rec[ ]. While coming down the stairs I [saw] a heavy set officer kick inmate Davidson in the back of his lower leg. We continued to the rec. I did not see Davidson report the incident to any one.

---

[2]As an initial matter, defendant argues that plaintiff's excessive force claim must be dismissed because plaintiff failed to exhaust his administrative remedies by filing a grievance regarding the incident, as required under the "compulsory exhaustion" provision of Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a). However, the Second Circuit has held that this provision does not apply retroactively to actions, like this one, pending when the PLRA was signed into law on April 26, 1996. *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir.2003). To the extent exhaustion was required under the law as it stood when this case was filed in March 1995, the Court finds that defendant waived the affirmative defense of non-exhaustion by failing to raise it until now. *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).

Plaintiff's Exh. 2A, p. 6.

Plaintiff urges that this statement, admittedly hearsay,[3] is nonetheless admissible as corroborative evidence under the business records exception to the hearsay rule because the statement was included in the investigating officer's written report which was prepared in the ordinary course of his official duties as a State Police Investigator. The business records exception, set forth at Rule 803(6) of the Federal Rules of Evidence, provides that:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> …
>
> **(6) Records of Regularly Conducted Activity.**—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed. R. Evid. 803(6).

It is well established that, while entries in a police or investigating officer's report which result from the officer's own observations and knowledge may be admitted under this exception, statements made to the officer by third parties under no business duty to report may not. *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (citing *United*

---

[3] " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Civ. P. 801(c).

*States v. Pazsint*, 703 F.2d 420, 424 (9th Cir.1983)).  Accordingly, the substance of inmate Dean's statement cannot be considered as corroborative evidence.

In addition, plaintiff's testimony about the incident lacks credibility in several respects.  For example, with regard to the severity of the injury caused by the kick, the ambulatory health records (Plaintiff's Exh. A) show that when plaintiff presented for a previously scheduled sick call appointment later in the morning of February 3, 1993, the physician's assistant who examined him found no contusions or abrasions, tenderness to touch, or any other outward signs of injury.  Photographs of plaintiff's back taken later that same day confirmed the absence of any visible markings consistent with his testimony about the force of the kick.  While plaintiff testified that bruising appeared at some later time, his ambulatory health records for the entire month following February 3, 1993 contain no information about bruising that would tend to confirm or corroborate this testimony.

Furthermore, there was unchallenged testimony that plaintiff routinely filed grievances, "tabs," or other complaints about the conduct of prison officials or the conditions of confinement at Attica.  Indeed, plaintiff testified that he had filed at least 40 grievances about his treatment at Attica prior to February 3, 1993, and at least 40 grievances about his treatment at Attica after that date, *see* Dkt. No. 389, at 44-48, yet he did not file a grievance about the events at issue.  His explanation that he feared retaliation from prison guards if he grieved this one incident involving defendant's use of force, when considered in the context of the proof that he grieved some 80 or so other incidents during his time at Attica without apparent fear of retaliation, simply strains credulity.

Equally unworthy of credence is plaintiff's testimony that, after investigating the incident, Sergeant Falcone reported to plaintiff that Officer Brzezniak admitted kicking

plaintiff, but "he didn't mean to …. He was just showing off. He meant to kick the air, but he made contact …." Dkt. No. 389, at 33-34. Plaintiff also testified that Sergeant Falcone told him he did not intend to put Brzezniak's statements about the incident in his report. *See id.* at 34. On both direct and cross examination, Sergeant Falcone categorically denied ever making these statements to plaintiff. *See* Dkt. No. 390, at 22-24. Even without this denial, however, the only reasonable inference to be drawn from plaintiff's testimony about his conversation with Falcone is that, if defendant applied any force at all, it was done so negligently, without the level of "wantonness" necessary to establish the subjective component of plaintiff's Eighth Amendment claim. In any event, considering the totality of the evidence in this regard, plaintiff's testimony that Sergeant Falcone told him *both* that he obtained a confession from defendant *and* that he did not intend to put the confession in his report of the incident is, simply, not credible. In light of this lack of credible support for plaintiff's version of the facts, the Court has no basis upon which to conclude that plaintiff's testimony is entitled to greater weight than defendant's testimony that the incident never occurred.

Accordingly, plaintiff has failed to establish by a preponderance of the evidence that defendant Brzezniak used even a *de minimis* amount of force against plaintiff on February 3, 1993, with a level of wantonness causing injury that could be considered harmful enough to establish a violation of plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

## B.    First Amendment/Retaliation

Plaintiff also claims that defendant's conduct violated the First Amendment's prohibition against retaliation for filing grievances and lawsuits against prison officials. To succeed on this claim, plaintiff must establish by a preponderance of the evidence that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003); *see also Pacheco v. Drown*, 2010 WL 144400, at *11 (N.D.N.Y. January 11, 2010) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).

Plaintiff clearly satisfies the first prong, since it is well established that prison inmates "have a constitutional right of access to the courts and to petition the government for the redress of grievances," *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), which includes the right to file lawsuits and prison grievances. *See Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("inmates must be permitted free and uninhibited access to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers."). However, based on the proof presented at trial, the Court finds that plaintiff has failed to establish by a preponderance of the evidence that defendant took adverse action against him that was causally related to his exercise of that right.

In order to find that defendant took adverse action against plaintiff causally related to plaintiff's filing prison grievances and lawsuits, the Court would have to credit plaintiff's testimony about the incident (*i.e.*, that after defendant kicked plaintiff in the back,

defendant stated, "That's . . . to let you know what's in store for you if you keep up your old habits of filing lawsuits and grievances") over defendant's testimony that he did not kick plaintiff in the back, did not make the statement, did not know plaintiff, and did not know about his propensity for filing grievances.  As discussed above with respect to plaintiff's excessive force claim, without any corroborating evidence to support plaintiff's version of the facts, there is simply no basis for the Court to find that plaintiff's testimony is entitled to more credence or weight than defendant's.  In the absence of such a finding, plaintiff cannot possibly meet the burden imposed by the law to show by a preponderance of the evidence that Officer Brzezniak took adverse action against him causally related to the exercise of his right to seek redress of grievances.

Accordingly, upon evaluation of the proof presented at trial in light of the legal standards for assessing liability under 42 U.S.C. § 1983, the Court as the trier of fact finds that plaintiff has failed to establish by a preponderance of the evidence that Officer Brzezniak's conduct on February 3, 1993 deprived plaintiff of his First Amendment right to be free from retaliation for filing grievances and lawsuits, or his Eighth Amendment right to be free from cruel and unusual punishments.  Plaintiff's Section 1983 claim is therefore dismissed.

## II.      State Law Claims: Assault and Battery[4]

Plaintiff also seeks damages for violation of the common law of assault and battery.

"To sustain a cause of action to recover damages for assault, there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact.  To recover damages for battery, a plaintiff must prove that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent."  *Bastein v. Sotto*, 749 N.Y.S.2d 538, 539 (App. Div. 2002); *see also Fugazy v. Corbetta*, 825 N.Y.S.2d 120, 122 (App. Div. 2006); *Merzon v. County of Suffolk*, 767 F. Supp. 432, 448 (E.D.N.Y. 1991).

Although there is some overlap between the standards for assessing a prison official's liability for assault and battery under the common law and liability under the Eighth Amendment for use of excessive force, the standards are not identical.  As Judge Friendly observed several decades ago in *Johnson v. Glick*:

> Certainly the constitutional protection [against cruel and unusual punishments] is nowhere nearly so extensive as that afforded by the common law tort action for battery, which makes actionable any intentional and unpermitted contact with the plaintiff's person or anything attached to it and practically identified with it . . . ; still less is it as extensive as that afforded by the common law action for assault, redressing "Any act of such a nature as to excite an apprehension of battery" . . . .

*Johnson v. Glick*, 481 F.2d at 1033 (quoting PROSSER, TORTS § 10, at 38 (4th ed. 1971)); *see Dufort v. Burgos*, 2005 WL 2660384, at *2 n. 1 (E.D.N.Y. Oct. 18, 2005).

---

[4]Defendant asserts in his post-trial brief that plaintiff's state law claims have been repudiated on the record, and in any event should be dismissed for lack of supplemental jurisdiction as barred by New York Corrections Law § 24.  The Court declines to address this issue since, as discussed in the text herein, to the extent such claims have been properly pleaded and litigated, plaintiff has failed to establish defendant's liability for assault and battery by a preponderance of the evidence at trial.

Nonetheless, the Court's finding above that plaintiff has failed to establish defendant's liability for violation of plaintiff's federal constitutional right to be free from cruel and unusual punishments pertains as well to plaintiff's assault and battery claims.  Simply put, plaintiff has failed to show by a preponderance of the evidence presented at trial that Officer Brzezniak engaged in any conduct on February 3, 1993 which resulted in offensive bodily contact, or placed plaintiff in imminent apprehension of harmful contact, necessary to impose liability for damages under the state or common law of assault and battery.

## **CONCLUSION**

Upon review of the evidence presented at the trial of this action on March 29 and 31, 2011, and upon consideration of the matters set forth in the parties' post-trial submissions and having heard closing arguments on June 21, 2011, the Court finds that plaintiff has failed to establish by a preponderance of the evidence that defendant engaged in conduct at the Attica Correctional Facility on February 3, 1993, which meets the legal standards for imposing liability under 42 U.S.C. § 1983 or the common law of assault and battery.

The foregoing constitutes the Court's findings and conclusions after trial, in accordance with Fed. R. Civ. P. 52(a).  The Clerk of the Court is directed to enter judgment in favor of defendant, pursuant to Fed. R. Civ. P. 58, and to close the case.

So ordered.

\s\ Richard J. Arcara
RICHARD J. ARCARA
United States District Judge

Dated:   July 27, 2011

-25-